IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Jamie Rydale Madrigal, | : | Case No. 3:10 CV 00638 |
| Petitioner, | : | |
| v. | : | **MAGISTRATE'S REPORT** |
| | | **AND RECOMMENDATION** |
| Robert Welch, | : | |
| Respondent. | : | |

This case, filed pursuant to 28 U.S.C. § 2254, was automatically referred to the undersigned Magistrate pursuant to Local Rule 72.2(b)(2). Pending are Petitioner's Motions to Stay Habeas Corpus and Requesting a Ruling on the Motion (Docket Nos. 5 and 15), Respondent's Return of Writ and Opposition to Motion to Stay (Docket Nos.10 and 11) and Petitioner's Response and Traverse to Return of Writ (Docket Nos. 17 and 18). For the reasons that follow, the Magistrate recommends that the Court deny Petitioner's Motion to Stay and dismiss the Petition for Writ of Habeas Corpus.

## I.  FACTUAL BACKGROUND

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), in a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to a judgment in state court, the factual findings made by a state court in the direct appeal are presumed to be correct. *Keith v. Mitchell*, 455 F. 3d 662, 666 (6th Cir. 2006) (*citing* 28 U. S. C. § 2254 (e) (1) (2006)). The petitioner

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.  28

U. S. C. § 2254(e)(1)(Thomson Reuters 2011).  Petitioner in this case does not contest any of the factual

findings.

On April 12, 1996, a Friday evening, Misty Fisher, Eric Armstrong, Brian Conley, and Carrie Tracy were working at a Kentucky Fried Chicken restaurant ("KFC") in Toledo.  Tracy was sixteen years old, and the other three were eighteen years old.  Fisher and Armstrong were both closing managers.  Around 8:15 p.m., a black male entered the restaurant.  Tracy was working at the front counter and asked the person if she could help him, but he said: "no, no."  After looking around the restaurant, the person exited.

Jeffrey Kerekes and Todd Corbett were on their dinner break from work and decided to go to the KFC for dinner.  As they pulled into the drive-thru, they realized that the speaker was not working and drove up to the window.  Tracy came over to the window to take their order.

The same black man who had previously been in the KFC returned.  A loud crash caught everyone's attention as the man jumped over the counter, shattering the glass on the refrigerated counter case.  The man hit Armstrong in the head and ordered everyone to the floor.  The man asked who the closing manager was, and Armstrong said he was.  Armstrong was then ordered to get up and get the money out of all the registers.  He did as he was told and put the money in a KFC bag on the counter.  The man then told Armstrong to open the safe, but Armstrong told him he did not have the combination.  When the man asked why he did not have the combination if he was the closing manager, Armstrong told him that Fisher had the combination.  The man grabbed Fisher by her ponytail and took both her and Armstrong back to the safe.

Armstrong was told to get on the floor, and Fisher was ordered to open the safe.  Fisher knelt in front of the safe, and the man held a gun to the back of her head.  She was scared and nervous, and said she could not get the safe open.  The man said "hurry up bitch."  Fisher asked Armstrong to help her, but as he got up, the man ordered him back to the floor.  When she still could not get the safe open, the man said "Now you're playing, bitch" and shot her in the back of the head.  The man exited through the back door.  Armstrong immediately got up and called 911.

Meanwhile, as Corbett and Kerekes were waiting for their order, they saw a man jump over the counter and hit Armstrong.  They saw a chrome-plated gun in the man's hand.  Realizing the KFC was being robbed, they pulled through the drive-thru and drove around the front of the building.  They noticed a man sitting on the driver's side of an older maroon Buick with chrome Cragar SS rims, which was parked against the back fence of the KFC parking lot.  The car was backed into the parking spot, and there was no license plate.  Corbett and Kerekes pulled around to the alley behind the KFC parking lot.  Kerekes got out and looked both under and over the fence, looking for a license plate on the back of the car, but there was none.

Kerekes got back in the car, and he and Corbett drove down to a 7-Eleven Store and asked the clerk to call the police and tell them a robbery was in progress at the KFC.  They then proceeded back to the KFC.  As they pulled into the parking lot, they noticed that the car was still parked in the same spot; however, the man in the car was now in the passenger seat.  They drove around the parking lot, and as they came to the back door, the door opened and a black man came out carrying a brown paper bag in his hands.  The man stopped momentarily and looked at them, then got into the maroon car and took off. Corbett and Kerekes again proceeded through the drive-thru lane.  This time Tracy was hanging out the window screaming that someone had been shot.

Corbett and Kerekes went into the KFC as the police and ambulance were arriving.  Fisher died on the way to the hospital from the gunshot wound to her head.

Corbett and Kerekes gave the police a description of the car and the direction it headed, but the police were unable to locate it that night.  The police took statements from Corbett and Kerekes and then took the three employee witnesses to the police station for their statements.  The witnesses described the man as a black man, medium complexion, in his late teens, early twenties, medium build, short hair, wearing tan boots, a dark-colored

2

hooded sweatshirt, and baggy pants.  Kerekes described the baggy pants as jeans, while Tracy described them as brown "Dickies" brand pants with cuts on the legs.

The following day, Corbett and Tracy were asked to return to the police station to attempt to create a composite sketch to help generate leads in the case.  As a result of leads coming into the police station, James Jordan was arrested.

On the Monday following the crime, the witnesses were asked to come to the police station to participate in a lineup.  Neither Corbett nor Kerekes picked anyone from the lineup.  Tracy picked out Jordan, even though she thought he was too short.  She later indicated that she picked him only because she thought she was supposed to pick someone out.

Also on Monday, Corbett contacted his father, who was employed at the Lucas County Sheriff's Department, and told him that he thought the police were looking for the wrong car, and indicated he needed to get a picture of the car to show police.  His father went to the local Buick dealership and got some books of older model cars and brought them to Corbett and Kerekes to look through.  They found a picture that resembled the car they saw at the KFC, and turned it over to police.  Police received a crime-stoppers tip that a Jamie Madrigal had purchased such a car and that the car they were looking for was at a house on Alldays Street.  Detective Robert Leitner, the chief detective investigating the case, went out to look at the vehicle.

After observing the vehicle, Leitner knocked on the door of the house and talked to Tina Boyd. He learned that Jamie Madrigal, Tina's boyfriend, owned the car.  He then inquired as to Madrigal's whereabouts and obtained some names and addresses.

On the Tuesday morning following the murder, Toledo police took Corbett to look at the vehicle at the Alldays address, and Corbett identified it as the car he saw in the KFC parking lot.  A search warrant was obtained and the car was seized.

Boyd contacted Leitner on Tuesday with the names of more of Madrigal's friends (Dennis Crawford and Chris Cathcart).  Police officers went out and interviewed the persons whose names Boyd had provided.  When the officers talked to Crawford, they learned that Crawford, Cathcart, and Madrigal were together at Madrigal and Boyd's house on the previous Friday night.  Crawford evidently told the officers that his girlfriend picked him up, leaving Madrigal and Cathcart at the house.

Cathcart was then brought in for questioning.  Cathcart gave two statements to the police, both implicating Madrigal in the robbery of the KFC and the murder of Fisher.  Cathcart admitted that he was the person in the car, while Madrigal was in the KFC.

After Cathcart gave his statements, he was arrested, an arrest warrant was issued for Madrigal, and a search warrant was issued for the Alldays Street address.  During the search of the premises, a pair of work boots, men's maroon pants, and a blue hooded sweatshirt were seized.

On Thursday morning, Boyd told police that Madrigal was in Cleveland. Evidently, Madrigal left Toledo in the early morning hours after the murder and went to the home of Rodney Pettiway (his half-brother) and Pettiway's girlfriend. He stayed there until early the following week.  Madrigal saw the Toledo Blade newspaper at Pettiway's house and commented to Pettiway that "he wanted to get it."  After his arrest, Madrigal contacted Pettiway from the county jail and asked him if he had "ratted him out."

FBI agents and police in Cleveland executed the arrest warrant on Madrigal, who was at the house of Tavio Burton.  Police forcibly entered through the back door of the house.  After stating why they were there, Burton motioned the officers to the living room area, where Madrigal was sitting on the couch.  He was arrested and taken into the kitchen area, where he was searched and advised of his rights.

Police conducted a "wing-span" search of the area surrounding the couch.  They received a written consent to search the house from Burton.  They asked Burton where Madrigal's belongings were, and were directed to a closet next to the couch.  A cloth suitcase and duffel bag were seized.  Several pairs of brown "Dickie" pants, with the cuffs cut, were found in one bag.  When police opened another bag, they found a nickel-plated revolver resting on top, and a bullet in the bag.

Madrigal was taken back to Toledo.  A photograph was taken of him when he was "booked," and the police put together a photo array including Madrigal and five other black males.  The photos were taken to Corbett,

3

Kerekes, and Tracy to see if they could make an identification.  Both Corbett and Tracy picked Madrigal's photograph out of the array.  Kerekes did not pick out a photo, indicating that he thought the quality of the photos was very poor.  All three identified Madrigal in court.

When Madrigal was arrested, he had a mustache and some facial hair.  These features also appeared on his Ohio Identification Card, which was found in his coat pocket.  When the witnesses to the offense were interviewed, none of them described the suspect as having a mustache or any facial hair, and the question of identity became the main focus of the defense case.

During the course of the investigation it was learned that both Madrigal and Cathcart had worked at the same KFC (although not at the same time) that was robbed.  Madrigal had worked the closing shift and knew the procedures for closing the store.

Madrigal's fingerprints were not found at the KFC, and the experts who examined the gun that was seized during Madrigal's arrest could not state with certainty that it was the murder weapon, nor could they exclude it as the murder weapon.  At Madrigal's trial, Cathcart asserted his Fifth Amendment right against self-incrimination, and therefore did not testify; however, his statements were admitted into evidence, over defense objection.

*State v. Madrigal,* 87 Ohio St.3d 378, 379-382, 721 N.E.2d 52, 57 - 59 (2000).

## II.  PROCEDURAL BACKGROUND.

A.    THE KENTUCKY FRIED CHICKEN CASE, CASE NO. CR 1996-5761.

During the May term of 1996, Petitioner was indicted as follows:

COUNT ONE:   On or about April 12, 1996, Petitioner purposely caused the death of Misty Fisher during the commission of aggravated robbery at a Kentucky Fried Chicken, a violation of OHIO REV. CODE § 2903.01(B).

Spec. One:    Petitioner committed aggravated robbery in violation of OHIO REV. CODE § §2929.04(A)(7), 2941.14.

Spec. Two    Petitioner had a firearm on or about his person or under his control while committing the offense in Count One, a violation of OHIO REV. CODE §§ 2929.71 & 2941.141.

COUNT TWO:   Petitioner committed a theft offense with a firearm, a violation of OHIO REV. CODE § 2911.01(A)(1).

Spec. One:    Petitioner had a firearm on or about his person or under his control while committing the theft offense in Count Two.

(Docket No. 10, Exhibit 1).

On January 12, 2007, Petitioner entered a plea of guilty to aggravated murder with the firearm specification as to Count One and aggravated robbery with firearm specification as to Count Two (Docket No. 10, Exhibit 2).

On January 26, 2007, Judge Frederick H. McDonald imposed the following sentence:

4

**COUNT ONE**:  Aggravated murder–Twenty years mandatory incarceration to life in prison.

Spec. One:      Firearm specification–Three years actual incarceration.

**COUNT TWO**:  Aggravated robbery–Ten years actual incarceration to twenty-five years.

The sentences as to the first and second counts were ordered to be served consecutively to each other.  The firearm specification as to the first count was ordered to be served prior to and consecutively to the sentences on the first and second counts for a total sentence of thirty-three years to life in prison (Docket No. 10, Exhibit 3).

**B.      THE PACIFIC CRAB HOUSE RESTAURANT CASE, CASE NO. CR 2007-1081.**

During the January term 2007, Petitioner was indicted as follows:

**COUNT ONE**:  On or about April 30, 1995, Petitioner purposely caused the death of Larry Loose while committing or attempting to commit aggravated robbery at the Pacific Crab House Restaurant.

Spec. One:      Petitioner had a firearm on or about his person or under his control while committing the offense.

**COUNT TWO**:  Petitioner was attempting or committing a theft offense and had a deadly weapon on his person or under his control at the time of the offense.

Spec. Two:      Petitioner had a firearm on or about his control while committing the offense of aggravated robbery in Count Two.

**COUNT THREE**:

Petitioner, by force or threat, did restrain Larry Loose of his liberty and freedom with purpose to facilitate the commission of any felony, a violation of OHIO REV. CODE § 2905.01 (A)(2).

Spec. Three:    Petitioner had a firearm on or about his person while committing the offense of kidnaping in Count Three.

**COUNT FOUR**:

Petitioner, by force or threat, did restrain Craig Tammarine of his liberty and freedom with purpose to facilitate the commission of any felony.

Spec. Four:     Petitioner had a firearm on or about his person or under his control while committing the offense in Count Four.

**COUNT FIVE**:  Petitioner, by force or threat, did restrain Dana Verstraete of her liberty and freedom with purpose to facilitate the commission of any felony.

5

Spec. Five:    Petitioner had a firearm on or about his person or under his control while committing the offense in Count Five.

**COUNT SIX:**    Petitioner, by force or threat, did restrain Amy Henry of her liberty and freedom with purpose to facilitate the commission of any felony.

Spec. Six:    Petitioner had a firearm on or about his person or under his control while committing the offense in Count Six.

**COUNT SEVEN**:

Petitioner, by force or threat, did restrain Sam Parker of his liberty and freedom with purpose to facilitate the commission of any felony.

Spec. Seven:    Petitioner had a firearm on or about his person or under his control while committing the offense in Count Seven.

**COUNT EIGHT**:

Petitioner, by force or threat, did restrain Andrea Carroll of her liberty and freedom with purpose to facilitate the commission of any felony.

Spec. Eight:    Petitioner had a firearm on or about his person or under his control while committing the offense in Count Eight.

**COUNT NINE**:

Petitioner, by force or threat, did restrain Rick Wilhelm, Jr., of his liberty and freedom with purpose to facilitate the commission of any felony.

Spec. Nine:    Petitioner had a firearm on or about his person or under his control while committing the offense in Count Eight.

On or about January 16, 2007, Petitioner entered a plea of guilty to one count of aggravated murder, one count of aggravated robbery and seven counts of kidnaping, pursuant to *North Carolina v. Alford*, 91 S. Ct. 160 (1970) (Docket No. 10, Exhibit 5).  Judge McDonald ordered that Petitioner be committed to the Ohio Department of Rehabilitation and Corrections to serve the following sentences:

**COUNT ONE:**  Aggravated murder–Twenty years mandatory incarceration to life in prison
Spec. One:    Firearm specification to Count One–Three years actual incarceration.

**COUNT TWO**:  Aggravated robbery–Ten years actual incarceration to twenty-five years.

**COUNT FOUR**:

Kidnaping–Ten years actual incarceration to twenty-five years.

**COUNT FIVE**:  Kidnaping–Ten years actual incarceration to twenty-five years.

**COUNT SIX**:    Kidnaping–Ten years actual incarceration to twenty-five years.

6

COUNT SEVEN:
> Kidnaping–Ten years actual incarceration to twenty-five years.

COUNT EIGHT:
> Kidnaping–Ten years actual incarceration to twenty-five years.

COUNT NINE:  Kidnaping–Ten years actual incarceration to twenty-five years.

The sentences were ordered to be served consecutively to each other.  The firearm specification as to Count One was ordered to be served prior to and consecutively to the sentences on all counts for a total sentence of 93 years to life in prison (Docket No. 10, Exhibit 6).

Petitioner perfected an appeal in the Court of Common Pleas, Lucas County, Ohio, on March 6, 2007 (Docket No. 10, Exhibit 7).  On March 20, 2007, Petitioner's notice of appeal was dismissed as untimely filed (Docket No. 10, Exhibit 8).

## C.    POST CONVICTION RELIEF.

On December 26, 2007, Petitioner filed a motion for leave to file a delayed appeal in the Court of Appeals for the Sixth Appellate District.  He argued that:

(1)    His case comprised extraordinary procedural complexities.
(2)    Evidence was "maliciously fabricated" against him by the State of Ohio.
(3)    His plea of guilty was involuntary.
(4)    He was indigent and forced to rely on court-appointed trial and appellate counsel.
(5)    He is innocent.

(Docket No. 10, Exhibit 11).

On February 5, 2008, the Court of Appeals granted the motion for leave to file a delayed appeal and ordered the  appointment of counsel (Docket No. 10, Exhibit 17).  The Kentucky Fried Chicken and Pacific Crab House cases were consolidated.

In his brief on the merits, Petitioner asserted the following assignments of error:

(1)    His plea  was involuntary.
(2)    The lower court erred in stacking the six kidnaping sentences.
(3)    The indictment in both cases was defective as it failed to allege a *mens rea* element for

7

aggravated robbery.

(Docket No. 10, Exhibit 20).

The Court of Appeals for the Sixth Appellate District affirmed the convictions and determined that Petitioner's assignments of error were not well taken (Docket No. 10, Exhibit 22).  Petitioner filed a notice of appeal in the Ohio Supreme Court on January 9, 2009 (Docket No. 10, Exhibit 23).  Petitioner requested that the Ohio Supreme Court consider the following substantial constitutional questions:

(1)  The mandates of CRIM. R. 7(A) & (B), OHIO REV. CODE § 2901.21(A)(2) and the Fifth Amendment of the United States Constitution and Art. 1 § 10 of the Ohio Constitution are applicable to crime other than robbery in violation of OHIO REV. CODE § 2911.02(A)(2).

(2)  A conviction obtained pursuant to a void indictment violates the mandates of CRIM. R. 7(A) & (B), OHIO REV. CODE § 2901.21(A)(2) and the Fifth Amendment of the United States Constitution and Art. 1 § 10 of the Ohio Constitution.

(3)  The guarantees of the Fourteenth Amendment of the United States Constitution are violated by the trial court's arbitrary and erroneous imposition of consecutive sentences for six counts of kidnaping from a single incident.

(Docket No. 10, Exhibit 24).

On April 8, 2009, Chief Justice Thomas J. Moyer denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question  (Docket No. 10, Exhibit 26).

Petitioner filed an application to reopen pursuant to App. R. 26(B) in the Court of Appeals on February 9, 2009 (Docket No. 10, Exhibit 27).  The Court of Appeals determined that appellate counsel's representation did not fall below the objective standard of reasonableness and there were no substantive grounds for relief from judgment (Docket No. 10, Exhibit 30).

Petitioner filed an application for reconsideration on March 17, 2009 (Docket No. 10, Exhibit 31).  On April 30, 2009, the Court of Appeals found that  the application for reconsideration lacked merits and was not well taken.  The Appeals Court denied the application (Docket No. 10, Exhibit 32).

On January 19, 2010, Petitioner filed a motion to withdraw guilty pleas in the Lucas County

8

Common Pleas Court.  His request for leave to withdraw his plea agreements is predicated on two principles.  First, his sentence is void as being contrary to law.  Second, he was denied the effective assistance of trial counsel (Docket No. 10, Exhibit 33).  On April 21, 2010, Judge McDonald denied the motions to withdraw the guilty pleas entered in the Kentucky Fried Chicken and Pacific Crab House cases (Docket No. 10, Exhibit 37).

**D.**     **WRIT OF HABEAS CORPUS.**

Petitioner asserted these claims in the Petition for Writ of Habeas Corpus.

(1)     The guarantees of the Fifth Amendment and Ohio Constitution were violated because the indictment failed to allege all essential elements required to be proved beyond a reasonable doubt.

(2)     A conviction obtained pursuant to a void indictment violates the Fifth Amendment and Ohio Constitution.

(3)     The trial court erred in imposing consecutive sentences for six counts of kidnaping derived from a single event.

(4)     The trial court abused his discretion in imposing sentences that are contrary to the sentencing provisions.

(5)     Appellate counsel was ineffective for the following reasons:
•     Failure to raise trial counsel's ineffectiveness
•     Failure to raise meritorious issues concerning the six kidnaping counts in the indictment
•     Failure to raise a meritorious issue of court-appointed counsel's ineffective assistance

(6)     Petitioner must be permitted to withdraw his guilty pleas as his sentences are contrary to law, void for being contrary to law, violative of the Ex Post Facto Clause and the product of ineffective assistance of counsel.

(Docket No. 1).

### III. JURISDICTION

A federal court has jurisdiction to consider a petition for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court only on the grounds that he or she is in custody in violation of the constitution or laws or treaties of the United States.  *Leslie v. Randle*, 296 F.3d 518, 521 (6th Cir. 2002) (*citing* 28 U.S.C. § 2254 (Thomson/West 2002)).

9

In this case, Petitioner is in custody at the Toledo Correctional Institution.  He has articulated claims that implicate the Fifth and Fourteenth Amendments.  The Magistrate finds that this Court has jurisdiction to address the merits of Petitioner's Writ of Habeas Corpus.

### IV. MOTION TO STAY

Petitioner contends that his petition, as currently filed, contains exhausted and unexhausted claims.  Petitioner prays that disposition of such mixed petition be stayed and held in abeyance pending the state court's resolution of his motion to withdraw pleas.

Respondent opposes the stay contending that this is not a case where the habeas petition contains mixed claims that would make a stay appropriate.  The claims in the motion to withdraw pleas have all been exhausted.

Under the stay and abeyance procedure, district courts retain jurisdiction over mixed petitions and the stay of further proceedings pending the complete exhaustion of state remedies. *In re Bowen*, 436 F. 3d 699, 704 fn. 2 (6th Cir. 2006) (*citing Duncan v. Walker,* 121 S. Ct. 2120, 2129 (2001) (Stevens, J., concurring)).  The procedure serves as an alternative to simply denying a petition containing unexhausted claims when the failure to retain jurisdiction would foreclose federal review of a meritorious claim because of the lapse of the AEDPA's one year limitations period.  *Id.*  In order to stay a federal proceeding and hold a habeas case in abeyance pending resolution of state court proceedings, the claim must be based on exceptional or unusual circumstances.  *Sitto v. Bock*, 207 F. Supp. 2d 668, 676 (E. D. Mich. 2002).

Assuming that Petitioner's claims have not been exhausted, this Court retains jurisdiction over mixed petitions.  However, granting a motion to stay proceedings until the appellate court has ruled on Petitioner's motion to withdraw guilty pleas is futile.  Resolution of Petitioner's motion to withdraw

guilty pleas is predicated on an alleged violation of Ohio law. State prisoners are entitled to federal habeas relief only available when a petitioner is in custody in violation of the Constitution or laws or treaties of the United States. There is no federal constitutional right to withdraw a guilty plea. *See United States v. Woods*, 554 F. 3d 611, 613 (6th Cir. 2009). Petitioner's claims asserted in the motion to withdraw guilty plea do not give rise to a cognizable constitutional claim subject to habeas review. Even if the stay were granted pending an appellate decision, denying Petitioner request for leave to withdraw his guilty pleas would not be considered in this habeas review as there is no clear issue of constitutional dimension. The Magistrate recommends that the Court deny the Motion for Stay.

### V. HABEAS CORPUS STANDARD OF REVIEW

In determining whether to issue a habeas writ, the standards set forth in the AEDPA govern the district court's review of a state court decision. *French v. Jones,* 332 F.3d 430, 435-436 (6th Cir. 2003), *cert. denied,* 124 S. Ct. 581 (2003). The AEDPA only provides habeas relief for a state prisoner in certain circumstances. *Id.* An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim--

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* (*citing* 28 U.S.C. § 2254(d) (2001)).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Id.*

11

Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id*.

### VI. MERITS OF PETITIONER'S HABEAS PETITION

The resolution of this case pivots on whether Petitioner's entire habeas petition is cognizable because he entered guilty plea at trial and later attempted to attack the proceeding through a federal habeas corpus.

A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. *United States v. Broce*, 109 S. Ct. 757, 762 (1989). Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary. *Id.* If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack. *Id.* A plea which is voluntary and intelligently made serves as a valid waiver of a defendant's constitutional rights, including claims of constitutional violations that preceded the guilty plea. *Tollett v. Henderson*, 93 S. Ct. 1602, 1608 (1973). A guilty plea extinguishes a defendant's right to collaterally attack independent claims of constitutional violations that are not related to whether the petitioner was deprived of the ability to decide intelligently and voluntarily to plead guilty. *Id.*

In the Traverse, Petitioner suggests that in hindsight, he imprudently accepted the plea agreements; nonetheless, he does not attack the voluntariness of his decision. He does not argue and nothing in the record suggests that such decision was not intelligently made. Petitioner's counsel represented to the court that he explained all of the constitutional rights attendant hereto. That he knowingly, intelligently, voluntarily waives and rejects these rights" (Docket No. 10, Exhibit 3, p. 8 of

12

86).  Prior to accepting the pleas in both cases, Judge McDonald gave Petitioner a lengthy explanation of the effect of his pleas, the imposition of mandatory sentencing and the gravity of his pleas.  Further, Judge McDonald advised Petitioner of his plea rights  pursuant to OHIO CRIM R. 11and the effect  of a guilty plea as a complete admission of guilt (Docket No. 10, Exhibit 3 p.8-28 of 86).  Petitioner solemnly admitted that he was not intoxicated or under the influence of drugs, that he could read and write and understand the English language and that he understood the nature of his crimes.  Petitioner confessed in open court that he robbed the Kentucky Fried Chicken at gun point and that he intended to cause the death of Misty Fisher (Docket No. 10, Exhibit 3, p. 29-31 of 86).  Petitioner affixed his signature to documents memorializing his guilt and the resulting plea agreements (Docket No. 10, Exhibit 3, p. 40 of 86).

Having considered the transcript of the sentencing hearing, the Magistrate is persuaded that Petitioner clearly understood the charges against him and the consequences of pleading guilty.  Because Petitioner failed  to show that his guilty pleas were not entered knowingly or voluntarily, he is unable to challenge his conviction based on the claims in the habeas proceeding.

## VII.  CONCLUSION

In view of the foregoing, the Magistrate Judge recommends that the Court dismiss the Petition for Writ of Habeas Corpus, deny the Motion to Stay, deny as moot Petitioner's Motion Requesting a Ruling on the Motion to Stay and terminate the referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Dated: January 31, 2011

## VIII. NOTICE

13

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.

14